UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

LINDA ANET ADAMS,                )
                                 )
                 Plaintiff       )
                                 )
         v.                      )  CAUSE NO. 2:08 cv 79
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security  )
                                 )
                 Defendant       )

OPINION AND ORDER

This matter is before the court on the Petition for Judicial
Review of the Decision of the Commissioner of Social Security
filed by the plaintiff, Linda Anet Adams, on July 2, 2008.  For
the reasons set forth below, the decision of the Commissioner is
**AFFIRMED.**

Background

The plaintiff, Linda Anet Adams, was born on November 4,
1960, to Yoland M. Robinson, the Social Security earner from whom
Adams seeks to receive benefits.  (Tr. 295)  When Adams was 16
years old, she began seeing Dr. Gloria Galante for mental health
issues.  (Tr. 298)  Dr. Galante prescribed antipsychotic medicine
for Adams.  (Tr. 298)  On February 2, 1978, 17 year old Adams was
hospitalized after becoming delusional.  (Tr. 133)  She was seen
at Methodist Hospital because her regular doctor was unable to
attend to her.  (Tr. 133)  The initial Occupational Therapy
Progress Note indicated that Adams "recently lives with her aunt.
Her mother recently remarried, and the patient felt unwanted in
her home . . . [h]er reason for hospitalization was 'crying and

felt depressed.' . . . She . . . was frequently fearful, and felt people in the hospital didn't like her." (Tr. 138) Furthermore, the record showed that Adams "attends scheduled activities with supervision but frequently requests to return to the nursing unit as she becomes frightened; thinks someone is going to kill her." (Tr. 138) The record further indicated that "[s]he has chosen several task oriented activities, but workmanship is very slow and somewhat haphazard: I question how well she concentrates." (Tr. 138) Adams was diagnosed with paranoid psychosis. (Tr. 138)

In a subsequent Occupational Therapy Progress Note, the therapist indicated that Adams suffered from "fears" - generalized fears of someone wanting to hurt her or people laughing at her. (Tr. 137) During occupational therapy at Methodist Hospital, Adams opened up about sexual fears such as male patients following her and looking at her and lesbianism. (Tr. 137) Adams had difficulty concentrating on a "rather simple project," but she completed the project and was pleased with the results. (Tr. 137) The OT goals and approach noted a need for Adams to "[a]cknowledge that many of her fears are real ones blown out of proportion, i.e., young women are apt to be noticed simply because they are attractive." (Tr. 137) Adams' clinical impression was acute psychosis, paranoid - probably schizophrenic. (Tr. 132, 134) She was released and recommended to follow-up with her psychiatrist, Dr. Galante, and to continue on Stelazine tablets until adjusted by Dr. Galante. (Tr. 133)

Adams continued to attend school, and she recalled having "terrible" grades and needing assistance from teachers to help her with her fears. (Tr. 316) Adams reported that she feared being beaten up or killed while at school. (Tr. 316) Despite Adams' limitations, she graduated from Martin Luther King Academy in June 1980, ranked 53 out of 71 graduates with a 1.20 grade point average. (Tr. 254)

During and following high school, Adams worked part-time in temporary positions with City Maintenance. (Tr. 97) Adams characterized her employment as "summer jobs" involving "minor labor" where she mostly picked up garbage and swept. (Tr. 97) Adams worked with the City Maintenance two hours per day, five days a week for $2.00 an hour between the years of 1974-1982. (Tr. 97)

In the early 1980s, Adams gave birth to her son. (Tr. 300) Adams reported that her son was premature, thus requiring her to feed him special formula and to give him medication for seizures. (Tr. 300, 303) Numerous times throughout the record, Adams stated that she had difficulty coping with her son's developmental delays and poor health. (Tr. 143, 338) Nevertheless, Adams indicated that she primarily cared for her son, with limited support from her mother, including giving him medication, cooking, cleaning, bathing, and dressing him. (Tr. 302-03) Adams testified that she could not work because of her mental condition and having to care for her son on a full-time basis. (Tr. 315)

On August 17, 1987, Adams entered into treatment at Methodist Hospital (Tr. 153, 250) for acute exacerbation of paranoid schizophrenia due to cannabis and was discharged with the same diagnosis. (Tr. 153, 154)  The Discharge Summary, written by Dr. Marcus Wigutow, indicated that Adams hallucinated and heard voices.  (Tr. 154)  Furthermore, another discharge summary prepared by Dr. A.K. Yeretsian indicated that Adams presented herself to the hospital emergency room in "a psychotic state with persecutory ideas, but also very depressed, thinking that she was under some spell, that there was doom and gloom and that she has committed some terrible sins and that she was going to die." (Tr. 155)  Adams claimed that she heard voices telling her things, such as "God is trying to tell me different things and people also."  (Tr. 158)  Dr. Wigutow's clinical impression was that Adams had schizophreniform and psychosis, most probably drug abuse to cannabis.  (Tr. 159)  Adams had been hospitalized "3 to 4 years ago" but claimed she had been in "'good mental health' since that time."  (Tr. 155)  The doctor noted that Adams had a child who was autistic, "and therefore quite unrewarding," that she was engaged in relationships with men that "turned out sour," and "she habitually abused marijuana."  (Tr. 156)  Additionally, the doctor stated "[w]e could not determine why, but it seemed that she got depressed and got paranoid on top of it."  (Tr. 156) The doctor noted that her prognosis was "guarded."  (Tr. 157) She was diagnosed with atypical psychosis and substance use

disorder, was placed on Stelazine, Prolixin, Decanoate, Cogentin, and Restoril, and was discharged into outpatient care. (Tr. 154)

Adams re-entered Methodist Hospital on November 22, 1987, due to suicidal gestures and depression. (Tr. 140) On this date, Dr. Yeretsian diagnosed Adams with acute depressive disorder with suicide attempt, chronic schizophrenia, and cannabis abuse. (Tr. 140) The History and Physical Report on that date indicated that Adams was 27 years old and came to the emergency room after overdosing on Tetracycline. (Tr. 143) Adams reported that "she got despondent because her son's health is not good and she is hooked on marijuana and does not know what to do . . . she smokes about four-five joints a day and drinks occasionally." (Tr. 143) The report continued:

> She is well-known to me. She has had psychiatric problems since the age of 16. I have been seeing her for about three years or so in the early 80's. She gets periodically psychotic with schizophreniform features, gets profoundly depressed, and has all the characteristics of a[n] individual who has a very diffused sense of identity (borderline character structure).

(Tr. 143)

The doctor further stated that she had been under his care the past few months and was put on anti-psychotic medications, but her mother represented that "she is no better." (Tr. 143) On November 23, 1987, Adams was diagnosed with chronic schizophreniform disorder; cannabis abuse; chronic dysthmic disorder with major depressive dips; and personality disorder, severe. (Tr. 146) Adams checked herself out of Methodist Hospital four days

later and against medical advice in order to elope. (Tr. 141)
Dr. Yeretsian noted that "this patient is well known to us" and
diagnosed her with acute depressive disorder with suicide at-
tempt, cannabis abuse, and "? Chronic schizophrenia." (Tr. 141)

On April 23, 1988, Dr. W. Bradley examined Adams for her
initial Social Security Disability application. He diagnosed her
as having a "recurrent psychotic disorder" and "most likely"
chronic schizophrenic as evidenced by her auditory hallucinations
and paranoid ideas and may have a recurrent major depression with
psychotic features. (Tr. 160-61) He further discussed in his
report that Adams felt like someone was going to kill her, was
feeling depressed, and had not smoked marijuana in over six
months, but that she still was having auditory hallucinations of
a commentary nature which she believed were the devil telling her
things like "[y]ou're going to die." (Tr. 160-61) Adams was
granted disability due to schizophrenia and affective disorder in
1988. (Tr. 290)

From 1997-2007, Dr. Mohammad Arshad treated Adams, and he
indicated that Adams had "thoughts of hallucination," had been
delusional, irritable, and angry, remained able to sustain mood
and behavior, and received medication management with no reported
side effects. (Tr. 167, 224, 243, 246) In April 2007, Dr.
Arshad indicated that Adams had been under his care since June
24, 1997. (Tr. 222) He reported that Adams was schizophrenic
and on medication and that she had not been able to work. (Tr.
222)

6

On April 6, 2004, Dr. J. Theodore Brown of the Indiana Department of Family & Social Services Disability Determination Bureau examined Adams' Disability Determination and psychiatric reports. (Tr. 183) Brown determined that Adams suffered from Major Depressive Disorder with Psychotic features; Rule-out Schizophrenia, Paranoid type; Paranoid Personality Disorder; and GAF of 60-65. (Tr. 185) It was determined by the Social Security Administration on April 21, 2004, that Adams' disability continued. (Tr. 14)

On March 22, 2006, Adams applied with the Social Security Administration (SSA) for Childhood Disability Benefits (CDB), alleging a disability onset date of February 2, 1978. (Tr. 60, 138) Finding Adams not disabled, Joelle Larsen, the claims examiner, denied Adams' claim initially on May 4, 2006, based on "insufficient evidence in file to evaluate the claimant's condition prior to age 22." (Tr. 60, 200) The letter accompanying the initial denial stated that there was "insufficient evidence available to establish a severely limiting impairment prior to your 22nd birthday." (Tr. 68) Adams filed a Request for Reconsideration on June 21, 2006. (Tr. 64) On that same date, Adams completed a Disability Report for an Appeal. (Tr. 117-130) On July 20, 2006, Dr. Joseph Pressner, another examiner, affirmed the findings made on May 4, 2006. (Tr. 187) The claim was denied upon reconsideration on August 10, 2006. (Tr. 59) On August 16, 2006, Adams was notified of this decision. (Tr. 61) The letter dated August 16, 2006, stated that the grounds of

denial were based upon the failure of the evidence to show any other condition, other than chronic paranoid schizophrenia, that would have significantly limited Adams' ability to work. (Tr. 63)

Adams submitted a Request for Hearing by Administrative Law Judge (ALJ) on September 5, 2006. (Tr. 57) On September 29, 2006, Adams received a letter from the Office of Disability Adjudication and Review outlining the hearing process. (Tr. 52-53) This letter included a list of contact information for legal services. (Tr. 55-56) The letter also noted that she would receive a notification of a hearing date at least 20 days prior to the hearing. (Tr. 52)

An administrative hearing was held in front of ALJ Dennis Kramer on May 14, 2007. (Tr. 288, 290) Also on May 14, 2007, Thomas J. Scully III and Christopher J. Boudi were appointed as representatives in this case for Adams. (Tr. 26) Boudi repre-sented Adams at the hearing. (Tr. 290) Adams testified in this hearing. (Tr. 295) Dr. Patrick Utz, medical expert, Thomas Grzesik, vocational expert, and Delaney Durham, Jr., a friend of Adams, also testified at the hearing. (Tr. 290)

Boudi argued that Adams was subject to a traumatic experi-ence at age nine or ten and then was raped at age 16. (Tr. 294) At age 16, Adams began seeing Dr. Gloria Galante for depression and was medicated for it. (Tr. 298) Counsel asked Adams about her daily routine, which she indicated consisted of waking up, washing dishes, and cooking meals for herself and her son. (Tr. 304-05) Adams testified that she did not drive and relied upon

friends or family to take her shopping once a month. (Tr. 306)
She stated that friends and family members helped her clean her
house, helped with her son, and took her places to give her a
break. (Tr. 306) She stated that they visited her about every
two weeks. (Tr. 308) Adams stated that she received psychiatric
treatment every two months under Dr. Mohammad Arshad and that she
heard voices the majority of the time she walked outside. (Tr.
306-07, 310) Adams testified that she did not have very good
concentration, memory, and energy level; had back pain; could
lift only ten pounds; and could stand for longer than 15 minutes
without sitting for five to ten minutes in between. (Tr. 310-313)

Dr. Utz testified on behalf of the government. (Tr. 318)
Utz testified that he never had seen the patient but that he
reviewed her record and clarified that she was taking Stelazine.
(Tr. 319-20) He stated that Adams graduated 53 out of 80 with a
1.20 GPA which translated into the middle 70s. (Tr. 320) He
inferred from this record that Adams "did all right in school and
was able to handle that apparently reasonably well." (Tr. 320)
He then continued in the same line of questioning to discuss Dr.
Wigutow's report from her 1987 hospitalization, noting that in
August of 1987 Adams admitted to using angel dust and cannabis
and that "the diagnosis he came up with at that early on was
psychosis, probably drug abuse – related drug abuse, which was
cannabis at that time." (Tr. 320) He continued that there were
two hospitalizations in 1988 and 1989 and that both times the
diagnosis was psychosis, probably drug induced. (Tr. 320) The

ALJ then directed Utz to testify about the 1978 hospitalization, to which Dr. Utz testified, "Well, I - couldn't read those. Yeah, yeah. That would be the same thing. Yeah." (Tr. 320) The ALJ then clarified, "Okay. So you could read parts of it?" to which Dr. Utz replies, "Yeah." (Tr. 320) He continued, "I would say it would be the same diagnosis." (Tr. 321)

Dr. Utz continued to review the records of doctors' impressions post-1978, including those of Dr. Bradley and Dr. Brown. (Tr. 321) Dr. Utz remarked that Dr. Bradley concluded she "appears to have a psychotic disorder," but this was a time the record indicated the absence of marijuana use for over six months. (Tr. 321) Upon examination in 2004, Dr. Utz testified that Dr. Brown's evaluation may have been affected by Adams' failure to disclose a history of drug abuse. (Tr. 321) Dr. Utz summarized from the evidence that Adams had a condition that had been diagnosed and recognized, and "[a]t one point in time drugs probably played more of a role in it. It's an on-going condition, which is treatable with medication and the medication that she's taking is appropriate for that, to reduce hallucinations or hearing voices and delusional thinking and so forth." (Tr. 321)

Dr. Utz further stated that he believed Adams had a psychotic disorder. (Tr. 322) When asked by the ALJ if it was schizophrenia, he replied, "No. I would not - that is mentioned in there. The schizophreniform is mentioned in there." (Tr. 322) He then provided testimony that the diagnosis was psychotic

10

disorder, not otherwise specified.  (Tr. 322)  Specifically, he
stated:

> Consistent with her presentation today and
> under personality disorder I would check
> paranoid personality disorder . . . mild
> . . . This seems to be something that may
> have PTSD component to it, too.  It may not
> be a personality disorder.  Maybe it fits
> someplace else, Your Honor, but there are
> some PTSD components to all of that . . .
> [h]er listing to her presentation today, it
> seems to me that her restriction of activi-
> ties of daily living are mild.

(Tr. 322)

He further confirmed that there were problems but not severe
ones.  (Tr. 323)  He noted that the key thing to her maintenance
of a less than severe level was continuing medication.  (Tr. 324)

On cross-examination, counsel asked how there was no severe
psychological impairment considering that Adams heard voices,
since age 16 felt like somebody was going to kill her, and
repeatedly was hospitalized based on fears and hearing voices.
(Tr. 328) Dr. Utz responded, "You have - quite frankly there are
two issues here.  One is what produced those originally and they
are produced by drugs obviously."  (Tr. 329)  When asked directly
about drug use prior to age 22, Dr. Utz admitted he thought he
saw drug use in the record but could have misread it, but that
the drug use was material to her hospitalizations in the 1980's.
(Tr. 329)

Dr. Utz then discussed Adams' level of impairment and
defined severe impairment.  (Tr. 332)  Dr. Utz stated that Adams
did not react to the voices, and a reaction was necessary for her

11

to fall under the moderate/severe range, such that the auditory hallucination became disruptive in her life. (Tr. 329, 331) Dr. Utz reiterated that the impairments Adams suffered from were not severe and that she was able to "function socially within a limited world." (Tr. 332)

Delaney Durham, Jr., Adams' friend of almost 20 years, testified that Adams "had a hard time dealing with people in social situations." (Tr. 338) He said that he had been with her when she heard voices. (Tr. 339)

After Durham's testimony, ALJ Kramer called Grzesik, a vocational expert, to testify about Adams' employability. (Tr. 339-40) Considering the claimant was able to do light work, was age 47 with a 12th grade education, and had no past work, Grzesik found that such a claimant could participate in unskilled work such as electronics worker, production assembler, and small products assembler. (Tr. 340-41) Adding to hypothetical one, ALJ Kramer then asked whether someone could find employment if she also could stand for 15 minutes, sit for five minutes, had no difficulty sitting, could lift and carry ten pounds occasionally, could not climb ladders or squat, could not bend to touch toes, and became out of breath walking down a flight of stairs. (Tr. 341) Grzesik affirmed that such a person could work as a call operator or information clerk. (Tr. 341) Kramer then added to hypothetical two the fact that the claimant did not like working around people or large crowds, and Grzesik answered it would not change his answer to hypothetical number two. (Tr. 341) Fi-

nally, ALJ Kramer added to the hypothetical that the claimant may have to take a one or two hour nap, two to three days a week. (Tr. 342)  Grzesik concluded that this would prevent her from doing any work.  (Tr. 342)  Upon cross-examination, counsel asked Grzesik why he responded to hypothetical three in the affirmative, and Grzesik explained that the call operator or information clerk position did not require a claimant to work in a group setting.  (Tr. 343)  In closing, the ALJ stated he would send a letter to Dr. Arshad asking him to explain why he believed Adams was disabled, and he adjourned the hearing.  (Tr. 346-47)

On August 7, 2007, Adams received a Notice of Decision denying her application for Childhood Disability Benefits.  (Tr. 11)  The Decision, written by ALJ Kramer, asserted that Adams "was not under disability within the meaning of the Social Security Act prior to attaining age 22."  (Tr. 14)  In applying the five-step sequential evaluation process to determine whether a person was disabled, the ALJ concluded on step two - whether the claimant had a medically determinable impairment that was severe - that Adams did not have a severe impairment.  (Tr. 15-17)  Furthermore, he concluded that Adams did not have an impairment that significantly limited her ability to perform basic work-related activities for 12 consecutive months. (Tr. 17)

Following the ALJ's issuance of an unfavorable decision on August 7, 2007, Adams filed a Request for Review by the Appeals Council.  (Tr. 278)  On August 28, 2007, Scully submitted additional evidence into the record.  (Tr. 8)  On October 17, 2007,

the Appeals Council allowed the new evidence into the record. (Tr. 9) After reviewing the record, the Appeals Council denied the Request for Review on January 23, 2008. (Tr. 5) This denial made the ALJ's decision the final decision of the Commissioner of Social Security, and subsequently Adams filed a timely complaint in this court seeking review of the Commissioner's decision. (*See* 42 U.S.C. §405(g) (offering instruction for appeals to the District Court)).

The claimant contests the ALJ's determination that Adams was not disabled as defined by the Social Security Act prior to November 3, 1982, the date she attained age 22. (Tr. 17) Specifically, the claimant contests the ALJ's finding that, prior to attaining the age of 22, the claimant had the following medically determinable impairments: a psychotic disorder, not otherwise specified; and a paranoid personality disorder, mild, with a likely post traumatic stress disorder component. (Tr. 16) Also, the claimant contests the ALJ's finding that she did not suffer from an impairment that significantly limited her ability to perform basic work-related activities for 12 consecutive months. (Tr. 17)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination as to whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive"); *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004) (stating that the standard of review is limited to determine whether the decision "was supported by substantial evidence or is the result of an error of law") (citations omitted). Substantial evidence requires that the evidence is sufficient enough for a reasonable person to conclude that the evidence supports the decision*. Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852 (1972); *Rice*, 384 F.3d at 369 (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). Upon review, the court must review the whole record. *Clifford*, 227 F.3d at 869. In reviewing an ALJ's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Clifford*, 227 F.3d at 869; *Rice*, 384 F.3d at 369 (*citing Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2004); *Binion ex. rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A "decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

To be eligible for Childhood Disability Benefits under Title II of the Social Security Act ("Act") §402(d), a claimant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In

order to determine whether an individual is disabled, an ALJ must consider all of the evidence in the record in order to make a determination. 20 C.F.R. §404.1520(a)(3). The ALJ must evaluate the facts through a five-step sequential evaluation. 20 C.F.R. §404.1520(a)(1); *c.f.* 20 C.F.R. §416.920 (providing five-step evaluative process for adults); 20 C.F.R. §416.924 (providing evaluative steps for children). The five steps are followed in order, and if the ALJ determines at any point in the analysis that the claimant meets the relevant provisions of that step, a disability determination is then made, and the ALJ does not continue onto the next step. 20 C.F.R. §404.1520(a)(4). At the first step, the ALJ considers the work activity, if any, of the claimant. 20 C.F.R. §404.1520(a)(4)(i). At the second step, the ALJ considers the medical severity of the impairment and its duration. 20 C.F.R. §404.1520(a)(4)(ii). At the third step, the ALJ considers the medical severity of the impairment to determine if it meets or equals an Appendix 1 listing and meets the duration requirement. 20 C.F.R. §404.1520(a)(4)(iii). At the fourth step, the ALJ assesses the residual functional capacity ("RFC"), which indicates a claimant's capability to perform work activities despite any limitations, and past relevant work of the claimant. 20 C.F.R. §404.1520(a)(4)(iv). Finally, at the fifth step, the ALJ assesses the RFC, age, education, and work experience of the claimant to see if other work and adjustment may be made so the person can be employed. 20 C.F.R. §404.1520(a)(4)(v). If the claimant does not meet the criteria at any one step, the

claimant will not be found disabled. 20 C.F.R. §404.1520(a)(4)(i-iv). Adams contends, on several grounds, that the ALJ improperly terminated her evaluation at step two of the analysis.

At step two of the sequential evaluation, the ALJ must consider the severity of the impairment. 20 C.F.R. §404.1520-(a)(ii). In order to satisfy the second step of the test, the claimant must prove that she has a "severe medically determinable physical or mental impairment" that lasted or is expected to last for a continuous period of 12 months. 20 C.F.R. §404.1520(a)(ii). *See also* 20 C.F.R. §404.1509 (stating the duration requirement referred to in the second step). An impairment or combination of impairments is severe if it significantly limits a claimant's physical or mental ability to do basic work activities such as use of judgment, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §404.1521(a-b). An impairment is considered "not severe" when it causes a minimal limitation on the "individual's ability to function independently, appropriately, and effectively in an age-appropriate manner." SSR96-3p.

When a claimant's symptoms suggest a greater level of severity than that which the objective medical evidence suggests, the ALJ must consider the credibility of the claimant's statements by evaluating: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medica-

tion the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restriction due to pain or other symptoms. 20 C.F.R. §404.1529(c); SSR 96-7p.

On appeal, Adams contends that the ALJ improperly determined that her impairment prior to age 22 was not severe.[1] Specifically, Adams complains that the ALJ's decision was not supported by substantial evidence because the ALJ (1) ignored evidence in the 1978 medical record and her medical history in hospital reports, (2) mischaracterized evidence in the 1978 medical record and from Dr. Utz's testimony, (3) added evidence into the record, (4) improperly determined that Adams' testimony was not credible, and (5) gave greater weight to the State's medical experts than Adams' treating physicians without providing a reason for doing so.

First, Adams contends that the ALJ did not address important facts from her 1978 medical records and her medical history in her later medical records, thus ignoring an entire line of evidence contrary to his findings that were favorable to the claim-

---

[1] In general, a plaintiff's argument that the ALJ's decision was substantively improper is a hard argument to sustain, as an ALJ's finding are conclusive when supported by substantial evidence. *See Williams v. Apfel*, 179 F.3d 1066, 1072 (7th Cir. 1999) (noting that the substantial evidence standard requires the court to accept the ALJ's conclusion as long as it is supported by substantial evidence in the record and that the court cannot "substitute our judgment for that of the Commissioner by reconsidering facts" or "reweighing evidence[.]")(citations omitted).

ant.  *See, e.g., **Zurawski v. Halter**,* 245 F.3d 881, 887 (7th Cir. 2001); ***Henderson v. Apfel***, 179 F.3d 507, 514 (7th Cir. 1999); ***Zblewski v. Schweiker***, 732 F.2d 75, 78-79 (7th Cir. 1983). Specifically, Adams contends that the ALJ failed to consider evidence that while in treatment in 1978, Adams' fears were many and frequent, her fears included that someone wanted to hurt her, she felt people did not like her and laughed at her, she had sexual fears that male patients were following her and looking at her, she often sought supportive reassurance from her therapist, she had trouble concentrating, and that the 1978 hospitalization was unrelated to substance abuse.

In ***Rice***, the court held that an ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability," and is not required to provide a written statement about every piece of evidence in the record.  ***Rice***, 384 F.3d at 371 (internal citations omitted).  The ALJ only needs to "make a bridge between the evidence and the outcome as to his . . . determination."  ***Rice***, 384 F.3d at 372. *See also* ***Haynes v. Barnhart***, 416 F.3d 621, 626 (7th Cir. 2005) (stating that the ALJ must build a logical bridge between the evidence and conclusion); ***Zurawski***, 245 F.3d at 889 (same); ***Clifford***, 227 F.3d at 872 (same).  The law does not require the ALJ to discuss every detail of the records, as long as he considered evidence in the record that was favorable to the claimant. ***Golembiewski v. Barnhart***, 322 F.3d 912, 917 (7th Cir. 2003).

Although the ALJ did not specifically reference Adams'
symptoms documented in the 1978 record, the ALJ considered the
1978 record, as a whole, by specifically mentioning that the
record described her as "fearful" and by indicating that she was
diagnosed with "acute psychosis, paranoid - probably schizophre-
nia."  The ALJ also considered Adams' testimony that she feared
others, disliked crowds, and had trouble concentrating, which
were similar to her 1978 record.  However, the ALJ also gave
consideration to the evidence that the patient's status was
"improved" and that she was re-integrating when she was released
to outpatient care with her treating psychiatrist.  Thus, the ALJ
properly considered a line of evidence favorable to the claimant,
yet found that the intensity, persistence, and limiting effects
on the claimant's abilities had improved and did not present a
disabling condition.

Along the same line of argument, Adams argues that the ALJ
failed to address Dr. Yeretsian's omission from her notes that
Adams' periodic psychotic episodes were affected by drug abuse.
In fact, Dr. Yeretsian did not commit himself to any position
about Adams' drug use.  It is simply absent from his record.
Thus, the ALJ did not err by failing to note silence of an issue
in the record.  An ALJ need not discuss every piece of evidence,
or lack thereof, as argued by Adams, so long as he has considered
important evidence.  *Rice*, 384 F.3d at 371 (internal citations
omitted).  The ALJ must address the evidence sufficiently "to
build a bridge from the evidence to his conclusion" in order for

his decision to pass muster, which the ALJ did. *See Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (finding that an ALJ must "build a bridge from the evidence to his conclusion" in order to affirm the decision). *See also Haynes*, 416 F.3d at 626 (same); *Rice*, 384 F.3d at 372 (same); *Zurawski*, 245 F.3d at 889 (same); *Clifford*, 227 F.3d at 872 (same). By referencing Adams' other admissions of marijuana use, the ALJ constructed a proper bridge between Adams' record of marijuana use and did not mischaracterize the evidence in order to reach a conclusion that her condition was not severe.

Second, Adams argues that the ALJ mischaracterized the 1978 medical report because the ALJ characterized her as "fearful, although many of her fears were blown out of proportion." Adams argues that this statement mischaracterized the occupational therapy progress notes which stated that Adams needed to "[a]cknowledge that many of her fears [are] real ones blown out of proportion." Adams argues that this erroneously implied that her mental condition was other than severe. She contends that this opinion requires reversal. *See* SSR 82-62 (stating that reasonable inferences may be drawn by the ALJ but that the ALJ cannot make speculations, presumptions, or assumptions); *White ex. rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) (reasoning that speculation does not meet the evidentiary standard of substantial evidence).

SSR 82-62 provides that an ALJ may draw reasonable inferences, but presumptions, speculations, and suppositions must not

21

be drawn.  SSR 82-62.  Furthermore, *White* adds that speculation is no substitute for evidence, and a decision based on speculation cannot be supported by substantial evidence.  167 F.3d at 375.  If Adams is suggesting that the ALJ speculated, presumed, or supposed that her condition was not severe based on this sentence of his decision, such a suggestion is not evident from the ALJ's decision.  The ALJ's decision neither denied that her fears were real nor intimated that they were blown out of proportion and were not severe.  The ALJ merely characterized her fears as being blown out of proportion, as did the occupational therapist in the 1978 record who stated that Adams needed to "[a]cknowledge that many of her fears were real ones blown out of proportion."  The ALJ's decision did not mischaracterize her fears as less than severe.

Furthermore, the ALJ did not speculate as the ALJ in *White* did.  *See* 167 F.3d at 375 (discussing that it was improper for the ALJ and SSA to speculate that a probate court would have ruled more favorably towards the plaintiff had she pursued her claim more vigorously or had drafted a more reasonable or modest request of money from her son's probate estate).  The record provides plenty of evidence – from the fact that Adams graduated high school and raised a child with special needs to Adams own acknowledgment that she had a long period of doing well after her 1978 hospitalization to the State medical expert finding that her symptoms were mild – to support the ALJ's belief that her symptoms were not so severe as to be debilitating.

Moreover, Adams complains that the ALJ mischaracterized the testimony of the state medical expert, Dr. Utz, regarding the 1978 medical records when he stated that Dr. Utz's diagnosis was "documented" in the 1978 record. While Dr. Utz testified that he believed Adams suffered from a psychotic disorder, not otherwise specified, and a paranoid personality disorder, mild with a likely post traumatic stress disorder component, the 1978 medical record did not reflect such a diagnosis. The 1978 record stated that Adams suffered from "acute psychosis - paranoid, probably schizophrenic," suggesting that her mental health problem was severe. However, earlier in the ALJ's decision, the ALJ correctly stated that the attending physician in 1978 diagnosed Adams with an acute psychosis - paranoid, probably schizophrenic. Looking at the record as a whole, it is clear that the ALJ determined that the 1978 record diagnosis was different from that of Dr. Utz.

Third, Adams contends that the ALJ mentioned evidence that does not exist in the record when he inferred that Adams had been using marijuana prior to November 3, 1982. *See, e.g., **Binion***, 108 F.3d at 788-89 (stating that an ALJ must consider all relevant evidence and may not select and discuss only that which favors his conclusion) (citation omitted). In ***Binion***, the court discussed whether the ALJ considered all relevant evidence or selected those pieces of evidence that would support his conclusion. 108 F.3d at 788-89. For every bit of evidence weighing against the claimant, there was an equal, if not stronger, piece

of evidence pointing towards the claimant's testimony. *Binion*, 108 F.3d at 788. Furthermore, the evidence in support of the claimant's position "was made at a time when the plaintiff had no incentive to skew the facts to support the present benefits application." *Binion*, 108 F.3d at 788. That is not the case here.

Adams admitted to using marijuana prior to age 22, even though when asked at the administrative hearing about her use she reported using only two times prior to age 22. The ALJ based his conclusion about her use on this testimony and on the 1987 medical record reporting that Adams was addicted to marijuana for a long period of time. The 1987 medical record indicated that she was addicted to cannabis and had used angel dust. Further- more, at the hearing, Adams had an incentive to skew the facts to a more favorable position in order to obtain benefits. Thus, the stronger evidence warranted a reasonable inference that Adams' use of marijuana may have extended back into her youth and exacerbated her impairment. And although there is no evidence in the 1978 medical record that marijuana played a part in Adams' health, the Seventh Circuit counsels that "even a 'sketchy opinion' is sufficient if it assures us that an ALJ considered the important evidence and enables us to trace its reasoning." *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). There- fore, this court does not find that the ALJ added evidence to the record but merely made a reasonable inference from the facts that

Adams admitted using marijuana in her teen years and had a recorded history of a longstanding addiction to marijuana.

Fourth, Adams argues that the ALJ improperly determined that her symptoms were "not entirely credible" and that, based upon this belief, the ALJ gave inappropriate weight to her activities in determining the severity of her condition. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). *See also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997). *See also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ has not made explicit findings and has not explained them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872.

The ALJ must determine a claimant's credibility only after considering the "symptoms, including pain, and the extent to

which [the claimant's] symptoms can reasonably be accepted as
consistent with the objective medical evidence and other evi-
dence."  20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473 F.3d
816, 823 (7th Cir. 2007)("[S]ubjective complaints need not be
accepted insofar as they clash with other, objective medical
evidence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703
(7th Cir. 2004).  If the claimant's impairments reasonably could
produce the symptoms of which the claimant is complaining, the
ALJ must evaluate the intensity and persistence of the claimant's
symptoms through consideration of the claimant's "medical his-
tory, the medical signs and laboratory findings, and statements
from [the claimant, the claimant's] treating or examining physi-
cian or psychologist, or other persons about how [the claimant's]
symptoms affect [the claimant]."  20 C.F.R. §404.1529(c).  *See
also* ***Schmidt v. Barnhart***, 395 F.3d 737, 746-47 (7th Cir. 2005)
("These regulations and cases, taken together, require an ALJ to
articulate specific reasons for discounting a claimant's testi-
mony as being less than credible, and preclude an ALJ from merely
ignoring the testimony or relying solely on a conflict between
the objective medical evidence and the claimant's testimony as a
basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally
unsupported by the medical evidence, the ALJ may not make a
credibility determination "solely on the basis of objective
medical evidence."  SSR 96-7p, at *1.  *See also* ***Indoranto v.
Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barn-***

26

***hart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).
>
> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994)

When the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than

> a single, conclusory statement. . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.
>
> SSR 96-7p, at *2

*See also* ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logi-

cal bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting* *Clifford*, 227 F.3d at 872). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ must examine the evidence both favoring and rejecting the claim of pain. *See* *Zurawski*, 245 F.3d at 888 (*quoting* *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)). ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.")(emphasis in original).

The existence of symptoms and diagnoses does not require an ALJ to find that a claimant suffers from a disabling impairment. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (stating that the existence of symptoms and diagnoses does not require the ALJ to find that a claimant suffers from a disabling impairment in light of the ability of the claimant to function when symptoms are controlled by medication and treatment). An ALJ may conclude that a person has a history of impairments but that the impairment is not so severe as to be disabling, especially in light of the claimant's ability to function when undergoing treatment or medication management. *See* *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007)(*citing* *Barrientos v. Secretary of Health and Human Services*, 820 F.2d 1, 2 (1st Cir. 1987)(finding that the medical evidence established that claimant's symptoms were largely controlled by medication and treatment); *Higgs*, 880 F.2d at 863 (holding that a disability does not have to be recognized

if the symptoms and diagnoses do not prevent the claimant from being able to function when on medication or receiving treatment).

In support of her claim, Adams argues that her teachers "arguably . . . accommodated for her fears, and her absences," thus indicating that Adams may have been totally disabled, but due to an indulgent teacher, she still was able to graduate. *See, e.g., Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005)("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.")(internal citations omitted). Here, however, the ALJ properly concluded that Adams had demonstrated a history of mental impairments, yet her impairments were not severe. The ALJ was not patently wrong in inferring from Adams' testimony, her school record, her medical history, and opinions of an examining physician and State agency mental health professionals that Adams was not severely disabled. The evidence indicated that Adams' psychotic episodes were improving after receiving therapy and medication management at Methodist Hospital in 1978 and that she continued treatment. Adams was able to function well enough to graduate high school, work a part-time job, and raise a child with autism. Later in life, Adams returned to mental health professionals for help, but she noted that she had been doing better for the past few years. Furthermore, Adams' medical records indicate that her symptoms, while still active, were largely con-

trolled by medication and treatment. *See **Higgs***, 880 F.2d at 863
(holding that a disability does not have to be recognized if the
symptoms and diagnoses has the ability to function when on medi-
cation or receiving treatment). Thus, the ALJ came to a reason-
able conclusion that Adams was able to participate in substantial
gainful activities prior to and shortly after age 22.[2]

For her fifth and final contention, Adams argues that the
ALJ gave greater weight to the State's medical expert, Dr. Utz,
rather than her treating physicians without providing an expla-
nation. A treating source's opinion is entitled to controlling
weight if the "opinion on the issue(s) of the nature and severity
of [the claimant's] impairments is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence" in the
record. 20 C.F.R. §404.1527(d)(2). *See also **Schmidt***, 496 F.3d at
842 (finding that the treating physician's opinion is given
controlling weight but "is not the final word on a claimant's
disability"); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir.
2003) (same). However, an ALJ may reject the opinion of a treat-

---

[2] Adams' counsel argues, by citing dicta from ***Gentle,*** 430 F.3d at 865, that
Adams' care of her autistic son was arguably less demanding than the work-
place. Counsel argues that "arguably, the infant being both premature and on
medication, slept most of the day and was not as demanding." Yet, absent from
the record is any evidence that shows that Adams' child slept most of the day
and was not as demanding. Counsel's argument trivializes the responsibility
that Adams had in dealing with providing for her child. The record amply
supports that Adams was quite frequently overwhelmed by the constant demands
placed on her as a single-parent of a special needs child, so much so that it
was often a portion of her history to her doctors as to contributing factors
to her breakdowns in 1987 and 1988, as well as absorbing a good part of her
time in therapy in subsequent years. Thus, it is inaccurate to characterize
Adams' care of her child as not nearly demanding as the workplace when the
record supports that this child was, in fact, demanding of Adams' time and
attention.

ing physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001). Upon doing so, the ALJ must minimally articulate his reasons for crediting *or* rejecting evidence of disability. *Clifford*, 227 F.3d at 870 (*quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (emphasis added). *See also* 20 C.F.R. §404.1527(d)(2) (stating that the Commissioner will always give good reasons in a decision for the weight given to a treating source's opinion). Ultimately, the weight accorded a treating physician's opinion must consider all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted).

Although Adams argues that the ALJ improperly gave too much weight to the evaluation by Dr. Utz, the state medical expert, Adams fails to recognize the fine line between a treating and a non-treating physician. In *White v. Barnhart*, 415 F.3d 654 (7th Cir. 2005), the court defined a treating physician as a physician who has examined a patient and has an ongoing treatment relationship with that patient. 415 F.3d at 658 (holding that a non-treating physician, as defined in 20 C.F.R. §404.1502, is "a

physician . . . who has examined you but does not have, or did not have, an ongoing treatment relationship with you"). A doctor who examines a patient on one occasion is not a treating physician. *White*, 415 F.3d at 658.

In Adams' case, the 1978 physician, whose name is not even recognizable by the record, stated that Adams was his patient only while she was hospitalized and recommended that Adams continue treatment under the supervision of her treating psychiatrist, Dr. Gloria Galante. Thus, the 1978 physician was "not a treating source as that term is defined by the regulations because he did not have an ongoing relationship with" Adams. Similar to the court in *White*, this court finds that the 1978 treating physician was not a treating physician. *See White*, 415 F.3d at 658 (holding that a physician who examined the claimant on one occasion was not a treating physician). Therefore, the ALJ was not required to give controlling weight to the 1978 physician over the non-treating State medical expert.

Furthermore, Adams argues that the ALJ did not properly give weight to Dr. Arshad's report that Adams was disabled and "has been unable to work." Notably, the ALJ provided an adequate explanation as to why he discredited Dr. Arshad. Primarily, Dr. Arshad did not treat Adams prior to age 22 and, in fact, became her psychiatrist ten years after her hospitalization in 1987. Nowhere in the medical record does Dr. Arshad discuss Adams' condition prior to age 22. Furthermore, while Dr. Arshad wrote a letter stating that Adams was unable to work, he failed to

respond to a request by the ALJ to explain his reasons as to why he believed that Adams was unable to work. *See **Skinner***, 478 F.3d at 843 (discussing that an ALJ may contact a treating physician for further information when the record is inadequate but that an ALJ is not required to order a consultative exam). Finally, the ALJ was left with the impression from Dr. Arshad's records that when Adams was on medication, she was able to maintain stability in her mood and behavior. *See **Skinner***, 478 F.3d at 843 (holding that ALJ did not commit error in assigning greater weight to the State's medical expert when the treating physician also noted that the claimant's condition was "fleeting" or "intermittent"). Therefore, the ALJ did not err in assigning greater credibility to the State's medical expert – who believed that Adams' illness was mild – than to Adams' current treating physician, Dr. Arshad, who gave no medically acceptable reasoning for his opinion that Adams was disabled to the point she could not work.

Thus, two non-treating physicians – the 1978 physician and the State's medical expert – gave opinions weighed differently by the ALJ. In order to determine the weight to be given to each opinion, an ALJ must look to 20 C.F.R. §404.1527 for guidance as to how to evaluate the opinions of treating and non-treating physicians in order to determine which one should receive the controlling weight. 20 C.F.R. §404.1527. Generally, the Code provides several factors for an ALJ to use in determining the weight to be given, including the treatment relationship, the length, nature, and extent of the relationship, the amount of

relevant evidence a doctor provided to support his opinion, the better explanation provided, the more consistent the opinion was with the rest of the record, the specialization of the doctor, and other factors (i.e. familiarity with the disability programs and their evidentiary requirements). 20 C.F.R. §404.1520(d)(1-6).

In this case, the ALJ gave greater weight to the State's medical expert, Dr. Utz, because he had read the entire record and observed the plaintiff at the hearing. Although he did not indicate why he discredited the 1978 attending physician, this silence does not require reversal because that unknown physician was not a treating source as that term is defined by the regulations. Therefore, the ALJ did not commit a reversible error when he gave the State medical expert more weight than other physicians.

―――――――――――――――――

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g).

ENTERED this 14th day of September, 2009.

s/ANDREW P. RODOVICH
United States Magistrate Judge